May 25, 2018

**Supreme Court**

| | | |
|---|---|---|
| Joseph Clifford et al. | : | No. 2015-379-Appeal. |
| | | (KC 14-345) |
| v. | : | |
| Gina Raimondo, in her capacity as Governor of the State of Rhode Island, et al. | : | |

| | | |
|---|---|---|
| Rhode Island Public Employees' Retiree Coalition et al. | : | No. 2016-24-Appeal. |
| | | No. 2016-25-Appeal. |
| | | No. 2016-26-Appeal. |
| v. | : | No. 2016-28-Appeal. |
| | | No. 2016-49-Appeal. |
| Gina Raimondo, in her capacity as Governor of the State of Rhode Island, et al. | : | (PC 15-1468) |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| Joseph Clifford et al. | : | No. 2015-379-Appeal. |
| | | (KC 14-345) |
| v. | : | |
| Gina Raimondo, in her capacity as | : | |
| Governor of the State of Rhode Island, et al. | | |
| | | |
| Rhode Island Public Employees' Retiree | : | No. 2016-24-Appeal. |
| Coalition et al. | | No. 2016-25-Appeal. |
| | | No. 2016-26-Appeal. |
| | | No. 2016-28-Appeal. |
| v. | : | No. 2016-49-Appeal. |
| | | (PC 15-1468) |
| Gina Raimondo, in her capacity as Governor | : | |
| of the State of Rhode Island, et al. | | |

Present: Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**

*"Economy is the method by which we prepare today to afford the improvements of tomorrow."*[1]

Rhode Island, unfortunately, failed to prepare for tomorrow. Its problems all came to a breaking point in 2009, at the depth of the recession, at which time government officials realized they needed to address the depletion of funding in the state and municipal employee retirement systems.[2] As a result, in 2009 and 2010, the General Assembly amended the statutes governing

---

[1] *Silent Cal's Almanack: The Homespun Wit and Wisdom of Vermont's Calvin Coolidge* 58 (David Pietrusza ed., 2008) (quoting Calvin Coolidge, 30th President of the United States, Third Annual Message to Congress, December 8, 1925, *Messages and Papers of the Presidents*, p. 9517).

[2] *See* Christopher D. Hu, *Reforming Public Pensions in Rhode Island*, 23 Stan. L. & Pol'y Rev. 523, 524 (2012) (At the national level, "[p]ension systems for retired state and local employees,

the pension system, changing the retirement age and reducing the cost-of-living adjustment (COLA). *See* P.L. 2009, ch. 68, art. 7; P.L. 2010, ch. 23, art. 16; *see also* G.L. 1956 chapters 8, 9, 10, and 10.1 of title 36; G.L. 1956 chapter 21 of title 45. In 2011, the General Assembly took more drastic action and passed the Rhode Island Retirement Security Act of 2011 (RIRSA), which abridged the retirement benefits of state and municipal employees even further. *See* P.L. 2011, chs. 408 and 409. In response, a number of lawsuits were filed by various state and municipal unions on behalf of their affected members.

In these appeals, we are asked to review a class-action settlement that was approved by a Superior Court trial justice in 2015. That class action was filed in April 2015 for settlement purposes only by the following parties: the Rhode Island Public Employees' Retiree Coalition (RIPERC); the Rhode Island American Federation of Teachers/Retirees, Local 8037 (AFT/R); Roger Boudreau; Michael Connolly; Kevin Schnell; the Rhode Island Council 94, AFSCME, AFL-CIO; the National Education Association–Rhode Island (NEARI); John Lavery; Michael McDonald; Jason Kane; Amy Mullen; Susan Verdon; the Rhode Island State Association of Firefighters; Raymond Furtado; and James Richards (collectively, the Union plaintiffs). The class action was filed against both state and municipal defendants. The state defendants are the following: Gina M. Raimondo, in her capacity as Governor of the State of Rhode Island; Seth Magaziner, in his capacity as General Treasurer of the State of Rhode Island; and the Employees' Retirement System of the State of Rhode Island, by and through the Rhode Island

---

many of which were already seriously underfunded,[] ha[d] taken a turn for the worse in the post-2008 recession. The stock market's slump * * * forced pension plans to adjust their investment projections downward, resulting in over $1 trillion in state and local unfunded pension liability."); *see also* William C. Burnham, *Public Pension Reform and the Contract Clause: A Constitutional Protection for Rhode Island's Sacrificial Economic Lamb*, 20 Roger Williams U. L. Rev. 523, 526 (2015) (at the time that government officials commenced the changes to the pension system, "Rhode Island was amid a period of economic decline so bleak that it prompted one commentator to hyperbolically characterize the state as 'an American Greece'").

Retirement Board, by and through Magaziner, in his capacity as Chairman of the Retirement Board; and Frank J. Karpinski, in his capacity as Secretary of the Retirement Board (collectively, the state defendants). The municipal defendants are the towns of Barrington, Middletown, and South Kingstown (collectively, the municipal defendants). While the Union plaintiffs approved of the settlement, filing briefs in this appeal in support of the state defendants, two groups of class-member plaintiffs appealed the trial justice's approval of the settlement in two separate actions, now consolidated on appeal. Those opponents are "the Clifford plaintiffs"[3] and "the Retiree plaintiffs."[4] For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

### A

### The State Employees' Retirement System

In Rhode Island, the state retirement board administers the state employees' retirement system—the Employees' Retirement System of Rhode Island (ERSRI)—and the municipal employees' retirement system—the Municipal Employees Retirement System (MERS).[5] *See* G.L. 1956 §§ 36-8-2 and 36-8-4(a). MERS, "which includes locally funded plans[,]" was established in 1951. Andre S. Digou, *A View of the Rhode Island Pension Landscape: The*

---

[3] The "Clifford plaintiffs" are a group of individual retired state and municipal employees who are not associated with the other retiree associations involved in these appeals.

[4] The "Retiree plaintiffs" include retirees of the Woonsocket, East Greenwich, North Kingstown, and Hopkinton police departments; the North Kingstown Fire Department; and the Rhode Island Department of Administration.

[5] The following two retirement plans are also part of the Rhode Island state system: the Rhode Island State Police Retirement Benefits Trust and the Rhode Island Judicial Retirement Benefits Trust. *See* Andre S. Digou, *A View of the Rhode Island Pension Landscape: The Potential Reform of Local Pension Plans Under the Preemption Doctrine*, 19 Roger Williams U. L. Rev. 740, 741 (2014).

*Potential Reform of Local Pension Plans Under the Preemption Doctrine*, 19 Roger Williams U. L. Rev. 740, 741 (2014). Rhode Island "pools plan funds for investment purposes," and the Rhode Island general treasurer chairs the retirement board; he or she "is responsible for the [system's] investment decisions and setting asset allocation strategies * * *." *Id.* at 741-42.

In 2009, the General Assembly enacted legislation that effectively redefined the service and/or age requirements for present employees. *See* P.L. 2009, ch. 68, art. 7. The following year, the General Assembly made further amendments, curtailing the COLA to "the first * * * $35,000 * * * of retirement allowance," and requiring that it not "commence [until] the third (3rd) anniversary of the date of retirement or when the retiree reaches age sixty-five (65), whichever is later." P.L. 2010, ch. 23, art. 16.

In 2011, as part of its legislative findings in passing RIRSA, the General Assembly explained its reasons for adopting the act as follows:

> "(1) The State of Rhode Island has one of the lowest funded and most vulnerable statewide pension systems in the country.
>
> "* * *
>
> "* * *
>
> "(4) The state retirement system's unfunded liability exceeds $7 billion as measured by well-established and accepted public accounting standards.
>
> "* * *
>
> "(6) Annual government contributions to ERSRI more than doubled between fiscal years 2005 and 2011 and those contributions are estimated to double again in fiscal year 2013 to exceed over $600 million. Without immediate and comprehensive legislative action future contributions will continue to grow dramatically and exceed $1 billion * * * in necessary annual contributions.

> "(7) If pension contributions continue to grow at the current and projected levels, they will be unaffordable and the pension security of our valued public employees will be placed in jeopardy." P.L. 2011, ch. 408, § 1.

In response to all of these fiscal issues facing the state, RIRSA included a minimum retirement age for certain employees and also made changes to the COLAs. P.L. 2011, ch. 408, § 7. Specifically, and at issue in this appeal, RIRSA stopped paying annual COLAs "until the state's pension plans [were] 80% funded overall[,]" which, as expressed by both sets of plaintiffs at oral argument in this appeal, is indefinite. Christopher D. Hu, *Reforming Public Pensions in Rhode Island*, 23 Stan. L. & Pol'y Rev. 523, 527 (2012).

**B**

**Lawsuits Filed by Unions and Retiree Associations**

After the passage of RIRSA, state and municipal employees suffered a severe diminution of their anticipated retirement benefits. This led to the filing of a number of lawsuits commencing in 2010 that challenged the enactment of the 2009 and 2010 amendments and RIRSA, which came to be known as "the pension cases."

The first lawsuit was filed in 2010 by a number of unions representing state employees and teachers, alleging that the 2009 and 2010 amendments violated the Contract, Takings, and Due Process Clauses of the Rhode Island Constitution. Then, in 2012, five lawsuits were brought on behalf of various unions and retirement associations challenging RIRSA, alleging the same constitutional claims as alleged in the 2010 lawsuit.

In 2013, all parties involved in both the 2010 and 2012 cases were ordered to attend mediation. After months of mediation, the parties reached a proposed settlement in February 2014, subject to approval by all members of the unions. The parties, however, failed to secure the necessary vote from the members, and so the litigation continued. In 2014, three more cases

5

alleging similar claims were filed, one of which was the so-called "Clifford" case, by a group of individual retirees. The lawsuits were eventually consolidated.

The parties engaged in extensive discovery—defendants produced more than 700 gigabytes of electronic documents and over four million pages of documents. The parties began preparation for a trial scheduled on April 20, 2015. In March 2015, the trial justice assigned a special master to oversee any remaining discovery issues; after the special master had worked with the parties, he announced that all parties except one group of plaintiffs[6] had reached a settlement approved by a majority of the group members.

Subsequently, on April 13, 2015, the parties filed a class-action lawsuit to implement the settlement, move for class certification, and appoint class representatives and class counsel. The parties also sought initial approval of the settlement terms and approval of notice procedures of the settlement to all members of the class action.

On April 16, 2015, after hearing argument on the motions, the trial justice issued a written decision granting the Union plaintiffs' motion for class certification in accordance with Rule 23(b)(2) of the Superior Court Rules of Civil Procedure, designating the class representatives and appointing class counsel for plaintiffs and defendants.

The plaintiff class was defined as follows:

> "All persons (and/or their beneficiaries) who, on or before July 1, 2015, are receiving benefits or are participating in the State Employees, Teachers, or Municipal Employees' retirement systems administered by ERSRI and all future employees, excepting only those individuals who on July 1, 2015, are participating in a municipal retirement system administered by ERSRI for municipal police officers in any municipality and/or for fire personnel of the City of Cranston[.]"

---

[6] Those plaintiffs included active Cranston police and firefighters.

6

Additionally, the trial justice certified a number of plaintiff subclasses, described as follows:

> "State Employees and Teachers: Participants in the Teachers and State Employees Retirement System (ERS) who are employed on or before July 1, 2015, but who have not retired as of June 30, 2015 and all future employees;
>
> "Participants in the Municipal Employees Retirement System (MERS), other than police or fire units: Participants in MERS, other than police or fire units, employed on or before July 1, 2015, but who have not retired as of June 30, 2015 and all future employees;
>
> "Participants in all fire MERS units, except for fire personnel of Cranston: Participants in all fire MERS units, except for fire personnel of Cranston, employed on or before July 1, 2015, but who have not retired as of June 30, 2015 and all future employees;
>
> "Retirees: All retired members and beneficiaries of retired members who retired on or before June 30, 2015, who are receiving a retirement benefit under ERS or any MERS unit."

The trial justice also certified the following defendant class: "All municipal entities that participate in MERS and all municipal entities that employ teachers who participate in the state employees and teachers' ERS."

As part of her decision, the trial justice summarized the terms of the proposed settlement as follows:

> "A one-time COLA payment of 2% applied to the first $25,000 of the pension benefit and that amount added to the base benefit will be paid to retirees (or their beneficiaries) who participate in a COLA program and who retired on or before June 30, 2012 as soon as administratively reasonable following the passage of the legislation based on the amount of benefit payable on the effective date of the legislation.
>
> "For funds that are not already funded, the settlement shortens the time intervals between suspended COLA payments from once every five years to once every four years. The settlement also improves the COLA limitation for current retirees whose COLA is

7

suspended. The settlement also requires a more favorable indexing of COLA Cap for all current and future retirees. The settlement also changes the COLA calculation to one more likely to produce a positive number and dictates that the COLA formula will be calculated annually, regardless of funding level, and when paid, the COLA will be compounded for all receiving a COLA.

"Current retirees (or their beneficiaries) who have or will have retired on or before June 30, 2015 will receive two payments: (1) a one-time $500.00 stipend (not added to the COLA base) within sixty days of the enactment of the legislation approving the terms of the settlement and (2) a one-time $500 stipend payable one year later.

"For State Workers, Teachers, and General MERS, the settlement (1) adds another calculation to reduce the minimum retirement age; (2) improves the available accrual rate for employees with twenty years or more of service as of June 30, 2012; (3) requires increased contributions by the employer to the Defined Contribution Plan for employees with ten or more years of service (but less than twenty) as of June 30, 2012; (4) waives the administration fee for any employees participating in the Defined Contribution Plan who make $35,000 or less; and (5) adds another calculation designed to limit the impact of the 'anti-spiking' rule imposed by the RIRSA on part-time employees.

"For MERS Firefighters (excluding Cranston Firefighters), the settlement (1) lowers the age and service requirements for retirement; (2) increases the accrual rate for Firefighters who retire at age fifty-seven with thirty years of service.

"For State Correctional Officers, the settlement increases the accrual rate for correctional officers with fewer than twenty-five years of service as of June 30, 2012.

"The settlement reduces the impact of an early retirement.

"The settlement allows Municipalities to 're-amortize'; that is, partially refinance, to be able to pay for the increased cost of the settlement.

"Otherwise, the terms of the RIRSA remain the same."

The trial justice found that the class settlement agreement warranted "an initial presumption of fairness," and concluded that it was "within the range of reasonableness."

8

Accordingly, she granted the parties' joint motion for preliminary approval of the class settlement. She also approved the parties' proposed method of notifying class members by mail, newspaper publication, and posting the settlement information on the ERSRI website. Additionally, the trial justice scheduled a fairness hearing for May 20, 2015, for the purpose of final approval of the settlement.

## C

### Objections to the Proposed Settlement

In response to the notices that were mailed and published for the benefit of class members, the Superior Court received approximately 400 objections to the settlement agreement, which raised a number of procedural and substantive concerns. Sixty-nine class members requested an opportunity to be heard at the fairness hearing.

There were a number of general objections, including that (1) the settlement was unfair because members have contractual rights to pension benefits; (2) the settlement negotiations and voter approval process were unfairly orchestrated; (3) the state's financial crisis was not so dire as to necessitate the drastic changes to the pension system; (4) the settlement affected certain groups disproportionately; and (5) certain class members were not part of the underlying cases or settlement discussions and wished to "opt out" of the settlement to pursue their individual claims. Some other specific objections were offered by certain groups of objectors. Specifically, a number of retirees contended that the settlement's reduction of their COLA would drastically affect their financial situations. In addition, Woonsocket police retirees in particular argued that the settlement was unfair because active police members were continuing to pursue their claims, and, if they were successful, the retirement fund would be diminished, making it less likely that the retirees would receive their promised COLA. The Clifford plaintiffs also objected, arguing

9

that the state failed to explicitly define the amount of compensation retirees would lose under the settlement.

**D**

**May 2015 Fairness Hearing**

At the fairness hearing, which spanned five days, the trial justice heard from the parties' counsel and from six witnesses. The Union plaintiffs also filed affidavits of class representatives who attested that they thought the settlement was fair, reasonable, and adequate to resolve their claims.

Joseph Newton, a principal actuary with Gabriel, Roeder, Smith & Company, testified for defendants. Newton testified that he provided actuarial services for ERSRI throughout the litigation of the pension cases. He testified that his analysis had demonstrated that the cost of the settlement would be about $30.8 million, not including re-amortization. During cross-examination, Newton explained that the settlement would cost the state more than RIRSA would have cost.

Robert A. Walsh, Jr., the executive director of NEARI, testified that the settlement was "a fair and adequate and reasonable solution[.]" Walsh testified that the Union plaintiffs had already invested approximately $1 million in legal costs in the litigation. Walsh also said that his members were cognizant of the risks involved in a jury trial with a high burden of proof for the Union plaintiffs on their claims. On cross-examination, Walsh acknowledged that, under the terms of the settlement agreement, retiree members would not receive "the future earnings of COLA[]s."

Roger P. Boudreau also testified as a class representative of the retiree subclass and the then-president of RIPERC and AFT/R. Boudreau explained that RIPERC filed its own lawsuit

10

and had sustained more than $400,000 in legal fees at the time of the hearing. He also described the efforts the organization made to notify its more than 5,000 members that the lawsuit was being filed, including publishing newspaper advertisements. With respect to the 2015 settlement discussions, Boudreau testified that his organization had concerns about succeeding at a jury trial with such a high burden of proof, which affected RIPERC's choice to join in the settlement agreement of March 2015.

Boudreau highlighted what he perceived as the benefits of the 2015 settlement, which he said were greater than the first proposed settlement. He also testified that the vote, which recommended presenting the settlement to their members by the leadership groups of the RIPERC organizations, was "virtually unanimous." According to Boudreau, RIPERC held a meeting to conduct an in-person vote on the settlement, which passed with about a seventy-five percent approval by the approximately 2,500 members who attended. On cross-examination, Boudreau testified that the 2,500 members who voted were out of a group of 27,000 retirees who would be affected by the settlement.

Mark A. Dingley also testified in his capacity as special counsel for the Governor.[7] He testified regarding the history of the legislative amendments to the pension system, describing the "underfunded" pension plans in 2011, when the state's "contribution levels were practically doubling." Dingley also explained that, while prior to RIRSA's enactment the state's "unfunded liability was $7.3 billion[,]" after its enactment, the liability was reduced to $4.286 billion. He also agreed that the 2015 settlement was fair, reasonable, and adequate. Dingley was also extensively cross-examined by counsel and by class members over three hearing days.

---

[7] Prior to his role as special counsel for Governor Gina Raimondo, Dingley served as the chief of staff and general counsel for Treasurer Frank Caprio, and then he was the general counsel and deputy treasurer for Raimondo when she was treasurer.

11

Next, Stephen Alfred, the town manager for South Kingstown and a class representative for the municipal defendants, testified. He stated that he was in favor of the settlement because, if the Union plaintiffs were to succeed at trial, "cities and towns would not be able to deal with the type of pension payments that would be required * * *." He also testified that, as of the date of the hearing, no municipality had objected to the settlement.

Patrick Marr, the deputy treasurer and chief operating officer from the Office of the General Treasurer, also testified. He explained that he assisted in coordinating the notification of the settlement to class members through mail, newspaper advertisements, and postings to the retirement website. He pointed out that the notices outlined the method by which class members could object to the settlement.

After the witnesses testified, the trial justice heard from class members who had timely requested to address the court. While sixty-nine class members submitted requests to address the court, only thirty-five members actually expressed their views during the fairness hearing. The trial justice reserved decision at the hearing and issued a written decision on June 9, 2015.

**E**

**The Trial Justice's Decision**

In her written decision, the trial justice reaffirmed her certification of the settlement classes in accordance with Rule 23(b)(2), consistent with her April 16, 2015 decision. She also determined that the class members had received adequate notice. Finally, in reviewing the terms of the settlement, the trial justice found that it was both procedurally and substantively fair.

After the trial justice's decision, the legislature enacted the 2015 amendments to RIRSA, implementing the terms of the settlement. *See* P.L. 2015, ch. 141, art. 21. Both the Clifford

12

plaintiffs and the Retiree plaintiffs appealed the trial justice's decision in the class action. On appeal, the Union plaintiffs joined the state defendants as appellees.

## II

### Standard of Review

When we review a trial justice's decision to certify a class in accordance with Rule 23 of the Superior Court Rules of Civil Procedure, we defer to a trial justice's "decision to certify a class[,]" and we will not disturb such a ruling "unless the trial court misconceived material evidence, substantially abused its discretion or was otherwise clearly wrong." *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 487-88 (R.I. 2004). "The trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23." *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 310 (3d Cir. 2008).[8]

Similarly, this Court will review a trial justice's decision to approve a class-action settlement for abuse of discretion. *See Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015). In considering such decisions, we will review issues of law *de novo*, while "factual findings are reviewed for clear error." *Id.*

## III

### Discussion

We begin by commending the trial justice for her exhaustive analysis, care, and attention in presiding over and adjudicating the pension cases, especially the settlement now before us. Although both the Clifford plaintiffs and the Retiree plaintiffs astutely attempt to diversify their

---

[8] We have "stated that, 'where the [f]ederal rule and our state rule are substantially similar, we will look to the [f]ederal courts for guidance or interpretation of our own rule.'" *Long v. Dell, Inc.*, 93 A.3d 988, 1005 (R.I. 2014) (quoting *Heal v. Heal*, 762 A.2d 463, 466-67 (R.I. 2000)).

13

arguments before us, there are only two arguments squarely remaining in plaintiffs' portfolio: whether the trial justice's certification of the class was appropriate, and whether the settlement was fair, reasonable, and adequate. We will first address the class certification issue, and then we will proceed to analyze whether the settlement approval was proper.

## A

### Class Certification

We first note that, to the extent that either the Clifford plaintiffs or the Retiree plaintiffs argued the merits of their claims in the context of their challenges to the trial justice's certification of the Union plaintiffs, those contentions are not relevant because courts are not to "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). The Clifford plaintiffs contend that they should not have been forced into a plaintiff subclass because, as retirees, they are differently situated than many of the other Union plaintiffs. In response, the state defendants counter that the Clifford plaintiffs' classification as retirees was accounted for by the subclass of retirees.[9] Further, the state defendants emphasize that the fact that class members do not agree with the settlement is insufficient to exclude them from the class, and does not automatically mean they will not be adequately represented.

In a slightly more nuanced argument, the Retiree plaintiffs aver that the trial justice should not have included them in a class for settlement purposes because they were not involved in the underlying litigation. The Retiree plaintiffs also mention the potential impact of the *International Brotherhood of Police Officers* case (No. PC 12-3169) on their future receipt of COLAs, as well as the differences among the abilities of various municipalities to pay for

---

[9] To the extent that the Union plaintiffs' arguments mirror those of the state defendants, we will only refer to the state defendants' arguments.

14

pension benefits.[10] Additionally, they maintain that they should not have been certified pursuant to Rule 23(b)(2) because class members received only money damages from the proposed settlement.

## 1

### Rule 23 Caselaw

When litigants seek class certification, Rule 23(a) of the Superior Court Rules of Civil Procedure requires the following: (1) "[t]he class is so numerous that joinder of all members is impracticable"; (2) "[t]here are questions of law or fact common to the class"; (3) "[t]he claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "[t]he representative parties will fairly and adequately protect the interests of the class." Trial justices must "conduct a 'rigorous analysis' of the[se] prerequisites to a class action before a class may be certified under Rule 23 * * *." *DeCesare*, 852 A.2d at 487 (quoting *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). Only when these prerequisites are met should Rule 23(b) be addressed. *Id.* at 486.

Rule 23(b) provides that a potential class must fit into one of three categories. *DeCesare*, 852 A.2d at 486. In this case, the Union plaintiffs sought to have the class certified pursuant to either Rule 23(b)(1) or (b)(2), but the Retiree plaintiffs argue that certification pursuant to Rule

---

[10] The plaintiffs in No. PC 12-3169 included active Woonsocket employees who were not included in the 2015 proposed settlement. The Retiree plaintiffs argue that if those plaintiffs were successful, such an outcome would impact the funding available for the Woonsocket municipal plan and delay their own annual COLAs. In response, the state defendants counter that the case has no effect on this settlement because it was rendered moot by the 2015 RIRSA amendments. We note that the trial justice found the case moot on August 21, 2015, and that decision was never appealed. Additionally, the case was dismissed by the United States Court of Appeals for the First Circuit. *See Cranston Firefighters, IAFF Local 1363, AFL-CIO v. Raimondo*, 880 F.3d 44, 45, 53 (1st Cir. 2018).

23(b)(3) is appropriate so that they have the choice to "opt out" of the settlement. Rule 23(b)(1) requires as follows:

> "(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
>
> "(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
>
> "(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]"

Rule 23(b)(2), on the other hand, provides that "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]" Additionally, Rule 23(b)(3) provides that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and * * * a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

"[C]ourts generally prefer to certify classes under Rule 23(b)(1) or (2) before certifying under Rule 23(b)(3)." *DeCesare*, 852 A.2d at 490 (quoting *Borcherding-Dittloff v. Transworld Systems, Inc.*, 185 F.R.D. 558, 562 (W.D. Wis. 1999)). The rationale for this preference is "that members of a class certified under Rule 23(b)(1) or (2) cannot opt out of the action, while members of a class certified under Rule 23(b)(3) are entitled to opt out and pursue individual suits." *Id.* (quoting *Borcherding-Dittloff*, 185 F.R.D. at 562). Due to the potential for "[i]ndividual claims brought by members opting out of the class * * * prejudic[ing] other class members or caus[ing] inconsistencies and compromises in future litigation[,]" *id.* (quoting

16

*Borcherding-Dittloff*, 185 F.R.D. at 562), courts prefer that "classes proceed under Rule 23(b)(2) because of its broader *res judicata* effect." *Id.* Certification pursuant to Rule 23(b)(3) should be pursued only "when the class is heterogeneous in composition, thereby necessitating the additional procedural protections afforded by opt-out and notice." *Id.*

**2**

**Analysis**

In her April 16, 2015 decision, the trial justice analyzed the four prerequisites of Rule 23(a) for class certification, concluding that the class met the prerequisites. First, the trial justice found that the numerosity factor was satisfied because the proposed class contained more than 60,000 people and defendants included "113 municipal entities which participate in MERS[.]"

Next, the trial justice considered whether there were questions of law or fact common to the class. She determined that all Union plaintiffs made constitutional challenges to the 2009 and 2010 Acts and to RIRSA, including allegations that the legislation violated the Contract, Takings, and Due Process Clauses of the Rhode Island Constitution. The trial justice found that all Union plaintiffs were either active or retired employees of municipalities or the state, and that all their claims were based upon the contention that RIRSA impaired their contractual rights to retirement benefits. Additionally, the trial justice concluded that all the state and municipal defendants also shared common questions of law and fact, and that they shared the same defenses to plaintiffs' claims.

With respect to the third requirement of Rule 23(a)—typicality—the trial justice found that the claims of the class representatives were typical of the claims of the whole class because the proposed representatives were "either current or former state employees, public school

teachers, or municipal employees" who were either members of the state or municipal retirement systems or already receiving pension benefits from those systems.

Moreover, the trial justice found that the legal theories and evidence used by the representatives would be the same for the other class members. She also found that the defenses of the defendants' representatives were typical of those of the whole. Finally, the trial justice determined that there was adequate representation, based on her findings that the attorneys were qualified and experienced and that no conflicts existed between the class representatives and the other class members.

Having found that the prerequisites of Rule 23(a) were met, the trial justice next analyzed whether the class could be certified under any of the three methods provided for in Rule 23(b). The trial justice concluded that both the plaintiff class and the defendant class qualified to be certified pursuant to Rule 23(b)(2). With respect to the Union plaintiffs' claims, the trial justice found that they all challenged the state defendants' enactment of RIRSA, which affected all Union plaintiffs' entitlement to retirement benefits. Moreover, the trial justice highlighted that the claims of the Union plaintiffs were equitable in nature—they sought "the restoration of their retirement benefits prior to the passage of the 2009 and 2010 Acts and the RIRSA." She also found that all defendants would be affected because all of the municipalities involved participated in MERS, indicating that the outcome of the settlement would affect the funding requirements for all defendant class members.

In her June 9, 2015 decision, the trial justice revisited the certification issue, and she reaffirmed the certification of the settlement classes. In doing so, the trial justice scrutinized a number of factors in determining whether there was "adequate protection for absent class members[.]" She recognized the need to generally apply a higher scrutiny to class-action

18

settlements. Still, she highlighted that this case did not present any danger of collusion between opposing counsel, there had been extensive discovery in the case, and the settlement had been overseen by a special master chosen by the court. The trial justice also analyzed whether the Union plaintiffs' attorneys were qualified and whether there were any conflicts of interest between the class representatives and the class members, concluding that the attorneys were well qualified and that no conflicts existed.

Finally, the trial justice found that the class members received adequate notice in accordance with Rule 23(e). She determined that the notice informed the class members of the action, summarized the essential terms of the settlement agreement, and described how members could object to the settlement terms by appearing at the fairness hearing. Moreover, she noted that the bulk of the objections to the settlement agreement had to do with its fairness, rather than lack of notice.

At the outset, we recognize that the review of class actions for settlement purposes requires heightened review. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("[U]ndiluted, even heightened, attention in the settlement context * * * is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."). We keep this in mind as we review the trial justice's decision regarding the class certification.

**a**

**Rule 23(a)**

With respect to the Rule 23(a) analysis, neither group of plaintiffs before us appears to quarrel with the numerosity requirement. As such, we proceed to determine whether the trial justice abused her discretion in finding that the remaining prerequisites were met. The Clifford

plaintiffs' claims were the same as the Union plaintiffs: that RIRSA's elimination of the COLAs amounted to a breach of contract, was in violation of the Contract, Takings, and Due Process Clauses, and constituted conversion and unjust enrichment. The second prerequisite of Rule 23(a) has been described to require that the commonality "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Nevertheless, in order to comply with Rule 23(a)(2), "even a single common question will do." *Id.* at 359 (internal quotations and alterations omitted).

Here, all Union plaintiffs certainly have a single question in common—whether the enactment of RIRSA amounted to a violation of the rights afforded by the Rhode Island Constitution. In consideration of the Clifford plaintiffs' claims for different damages, "[t]he need for individual damages calculations * * * does not diminish the appropriateness of class action certification where common questions as to liability predominate." *DeCesare*, 852 A.2d at 488 (quoting *Seidman v. American Mobile Systems, Inc.*, 157 F.R.D. 354, 366 (E.D. Pa. 1994)). Similarly, the Retiree plaintiffs' contention that outside litigation might affect the ability of their respective municipalities to afford their pension benefits in the future is not the proper inquiry for purposes of class certification. Indeed, whether the damages to individual plaintiffs differed among categories of active employees and retirees does not affect a determination under Rule 23(a)(2). *See id.* Consequently, we are satisfied that the trial justice did not abuse her discretion in ruling that there were factual and legal questions common to the entire class.

Turning to the third requirement, we are also satisfied that the claims of the class representatives are typical of the claims of the entire class. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be

20

represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). The trial justice appointed class representatives specifically for each of the subclasses, including the retiree subclass, assuring that all Union plaintiffs were represented by individuals who had alleged the same constitutional challenges to RIRSA as they had alleged. *See id.*

In addition, we conclude that the trial justice did not err in finding that the fourth requirement was met. "Adequate representation depends on two factors: (1) the plaintiff[s'] attorney[s] must be qualified, experienced, and generally able to conduct the proposed litigation; and (2) the plaintiff[s] must not have interests antagonistic to those of the class." *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania*, 745 F.2d 248, 262-63 (3d Cir. 1984). Here, the trial justice engaged in a lengthy inquiry into the attorneys' qualifications, experience with labor law, and ability to represent the retiree subclasses. The state defendants note that the testimony at the fairness hearing demonstrated that the Clifford plaintiffs and the Retiree plaintiffs were adequately represented because the settlement addressed the concerns of retirees who were older than seventy years of age.[11] The Clifford plaintiffs' dissatisfaction with the settlement and the way the attorneys for their subclass handled the claims is not a sufficient basis to establish that the trial justice erred when she found the Union plaintiffs were adequately represented before her. *See DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (acknowledging that the fact that the plaintiffs did not approve of the settlement did "not of itself, demonstrate that * * * class counsel provided inadequate representation" because "[t]o

---

[11] The state defendants cite to the fairness hearing testimony by Boudreau that the settlement would be beneficial to retirees because it provided a one-time two percent COLA on the first $25,000 of a retiree's pension benefits, which was favorable given the number of retirees who were at the "upper end of the age spectrum[.]" The brief also cited the testimony of Walsh and Dingley to a similar effect.

hold as much would require decertification any time an objection is raised to a class," which is "certainly not the standard envisioned by Rule 23").

Furthermore, the trial justice found that there were no conflicts of interest between the class representatives and class members, and we agree with the state defendants that she did not err in this determination. All class members shared a similar goal with the various class representatives: to preserve their pension benefits that existed prior to the 2009 and 2010 amendments and the enactment of RIRSA. *See Professional Firefighters Association of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645, 647, 648 (8th Cir. 2012) (upholding the district court's certification of a class action challenging the enactment of a city ordinance that changed the plaintiff-employees' health-care plans and finding that the plaintiffs had adequate representation even where both active employees and retirees were appointed the *same* class counsel because their "driving interest [was] to enjoin the city's enforcement of the ordinance"). Accordingly, we hold that the trial justice did not err in her findings regarding this requirement of Rule 23(a).

Additionally, the Retiree plaintiffs contend that their lack of participation in the underlying litigation should have kept them from being made part of the class for settlement purposes only; but that argument misconstrues the entire purpose of a class action. Class actions, by definition, inherently contemplate missing plaintiffs. *See Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1262 (R.I. 2003) ("The class action provides an exception to the traditional confrontation between a plaintiff and a defendant by allowing the named-class plaintiff or named-class defendant to represent interests of others with similar claims who are absent from the court." (quoting *Cabana v. Littler*, 612 A.2d 678, 684 (R.I. 1992))). Rule 23 does not require that each class member has participated in the underlying litigation, but requires only that the trial justice certify the class in accordance with its provisions. *See id.* In addition,

22

the safeguards for such are in the form of heightened review when a class action is filed for settlement purposes only. *See Amchem Products, Inc.*, 521 U.S. at 620. Therefore, the trial justice's inclusion of the Retiree plaintiffs in the retiree subclass was proper, pursuant to the prerequisites of Rule 23(a).

**b**

**Rule 23(b)(2)**

Having concluded that the trial justice did not err in finding that the prerequisites of Rule 23(a) were met, we now turn to whether her decision to certify the class pursuant to Rule 23(b)(2) was appropriate. Rule 23(b)(2) is properly applied "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360. It will not apply to cases where "each class member would be entitled to an individualized award of monetary damages." *Id.* at 360-61. Moreover, there is no requirement with Rule 23(b)(2) that "class members be given notice and opt-out rights[.]" *Id.* at 363.

The trial justice found that all of the Union plaintiffs' claims sought equitable relief— "the restoration of their retirement benefits prior to the passage of the 2009 and 2010 Acts and the RIRSA." "If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *DeBoer*, 64 F.3d at 1175 (quoting 7A Charles A. Wright et al., Federal Practice and Procedure § 1775, at 470 (1986)). Significantly, "[t]he fact that [damages were] sought incidentally to the prayer for injunctive relief does not affect this result." *Id.* (quoting *Paxton v. Union National Bank*, 688 F.2d 552, 563 (8th Cir. 1982)). In the case at bar, the award paid to all plaintiffs in the settlement is not relevant to a Rule 23(b)(2) analysis. Rather, we look to the relief sought in the

23

class-action complaint, which is mainly declaratory and equitable relief.[12]  As such, we conclude

that the relief sought fits squarely within those claims contemplated by Rule 23(b)(2), and, thus,

because any money damages would be incidental to the declaratory and equitable relief sought,

the trial justice did not abuse her discretion in certifying the class pursuant to that subsection.

*See Wal-Mart Stores, Inc.*, 564 U.S. at 360; *see also DeBoer*, 64 F.3d at 1175.

**c**

**Rule 23(c)(4)(B)**

The Clifford plaintiffs' arguments on appeal focus mainly on their discontent at being

made part of the class action—they argue that their identity as retirees distinguishes them from

---

[12] Specifically, the class-action complaint prayed that the Superior Court:

> "a. Issue declaratory judgment declaring that the 2009 and 2010 Acts and/or RIRSA contravenes the Due Process, Contract and Takings Clauses of the Rhode Island Constitution, Article I, Sections 2, 12 and 16;
>
> "b. Issue equitable relief including, but not limited to, a permanent injunction prohibiting the [d]efendants, including the ERSRI and the Retirement Board, from relying upon or applying the provisions of the RIRSA to vested employees and retirees, including those employees with at least ten years of contributory service on or before June 30, 2012, and/or already-retired employees, and to restore and make whole all retirement benefits diminished by application thereof;
>
> "c. Issue equitable relief including, but not limited to, a permanent injunction prohibiting the [d]efendants, including the ERSRI and the Retirement Board, from relying upon or applying the provisions of the RIRSA to employees within [p]laintiffs' bargaining units that had, prior to November 18, 2011, collectively bargained for a COLA;
>
> "d. Award [p]laintiffs the costs of the suit;
>
> "e. Award such other and further relief as the [c]ourt deems necessary and proper."

other plaintiffs. While this is true, this very situation has been contemplated by Rule 23(c)(4)(B), which provides that "[w]hen appropriate * * * a class may be divided into subclasses and each subclass treated as a class * * *." Here, that is exactly what the trial justice did, recognizing the concerns that the Clifford plaintiffs now raise—that the subclass of retirees had differing interests from active employees. Federal courts have recognized the legitimacy of this approach. *See, e.g.*, *Monarch Asphalt Sales Co., Inc. v. Wilshire Oil Company of Texas*, 511 F.2d 1073, 1077 (10th Cir. 1975) ("[r]epresentatives of one group may not adequately represent members of another group[,]" and "[t]hese factors justify the discretionary creation of * * * appropriate subclasses"). Notwithstanding the validity of certifying subclasses, there is nothing that requires the trial justice to create sub-subclasses based on class members' varying unique circumstances. *See International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. General Motors Corporation*, 497 F.3d 615, 629 (6th Cir. 2007) ("[I]f every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair.").

## B

## Fairness of the Settlement Agreement

## 1

## The Parties' Arguments

Turning to the terms of the settlement agreement, we first address the Clifford plaintiffs' main contention that the trial justice failed to rule that RIRSA violates both the Contract Clause and the Takings Clause. However, the state defendants maintain that such a ruling was not necessary in deciding whether the settlement was fair and reasonable. We briefly note that our

inquiry is confined to whether the trial justice abused her discretion in approving the settlement, which included addressing the merits of the claim as just one of the *many* factors affecting whether the settlement was fair. With respect to the Retiree plaintiffs' argument that they were not parties to the underlying cases and therefore did not have a voice in the settlement negotiations, the Union plaintiffs counter that the Retiree plaintiffs had ample time to file or join an action, but never did so.

**2**

**Analysis**

A class-action settlement has to be "fair, reasonable, and adequate." *Bezdek*, 809 F.3d at 82 (quoting Fed. R. Civ. P. 23(e)(2)). While there are a number of factors a trial justice may use to decide whether a settlement is reasonable, "the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Id.* (quoting *National Association of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009)).

There are nine factors, outlined in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), that federal court judges consider in making such determinations regarding class-action settlements. *See In re Tyco International, Ltd. Multidistrict Litigation*, 535 F.Supp.2d 249, 259 (D.N.H. 2007) (quoting *Grinnell Corp.*, 495 F.2d at 463); *see also In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 206-07 (D. Me. 2003).[13] Those factors are as follows:

---

[13] "Although federal district court decisions are not binding on this Court, they may guide us in the interpretation of our own rules." *Plante v. Stack*, 109 A.3d 846, 855 n.6 (R.I. 2015).

"(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *In re Tyco*, 535 F.Supp.2d at 259 (quoting *Grinnell Corp.*, 495 F.2d at 463).

Furthermore, "a settlement following sufficient discovery and genuine arm's-length negotiation is presumed fair." *In re Compact Disc*, 216 F.R.D. at 207.

First, we review the trial justice's initial determination that the settlement was procedurally fair. In her June 9, 2015 written decision, the trial justice first addressed the procedural fairness of the settlement. She found that the presumption of fairness applied to the settlement, as there was no indication of collusion. She also concluded that the settlement was "the result of well-informed and arm's-length negotiations by competent and dedicated counsel who provided loyal and effective representation to all parties." Additionally, the trial justice highlighted that the settlement was the result of earlier settlement attempts by the parties and, as such, was not entered into immediately prior to trial; in other words, the settlement had been under consideration for quite some time, and it was no "eve of trial" settlement.

Moreover, after her initial decision on April 16, 2015, finding that the settlement appeared fair and reasonable, the trial justice required the parties to notify class members by mail, newspaper publication, and through the ERSRI website. The trial justice also held five days of testimony at a fairness hearing, wherein the parties and objectors could be heard on the fairness of the settlement terms; those who testified included thirty-five of the sixty-nine class members who had originally requested to be heard. All class members received notification of

27

the fairness hearing, and all were given ample opportunity to object in writing or to testify at the hearing. Thus, we are satisfied that the trial justice did not abuse her discretion in finding that the settlement was procedurally fair.

We now address the substantive fairness of the settlement terms. In her decision, the trial justice thoroughly analyzed the *Grinnell* factors, ultimately concluding that the settlement was "fair, adequate, and reasonable." With respect to the first factor, the trial justice stated that "the complexity of the underlying pension cases" could not be "overstate[d.]" We agree that the complexity of the pension cases and the duration of the controversy certainly weigh in favor of settlement. *See In re Tyco*, 535 F.Supp.2d at 259. The settlement involved nine consolidated cases, and the majority of the lawsuits had been pending for three years at the time of settlement. The Union plaintiffs were expending substantial costs, and there was testimony at the fairness hearing that they had already invested approximately $1 million in legal costs and could be expected to spend up to $100,000 per week leading up to the trial. We agree with the trial justice that these factors and the complex nature of the constitutional claims alleged weighed in favor of the proposed settlement.

The trial justice next scrutinized the reaction of the class, noting that more than 60,000 notices were sent to class members regarding the settlement, but she received only 400 written objections. *But see TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) ("[M]ajority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable."). Nevertheless, the trial justice considered many of the objectors' concerns. For example, she contemplated the argument that the objectors had a constitutional right to a three percent COLA, and determined that the caselaw was unclear

28

regarding whether the objectors would succeed on that argument, citing *Arena v. City of Providence*, 919 A.2d 379, 393 (R.I. 2007), but that these specific concerns were voiced by two class representatives of the retiree subclass during negotiations. The trial justice finally concluded that, although the objectors' concerns had some merit, they still were in a very small minority of the group and, in fact, the settlement could be—as Walsh testified at the fairness hearing—"heartbreaking" but fair at the same time. We cannot say that the trial justice abused her discretion in considering this factor and determining that it weighed in favor of a fair settlement.

The third factor involves the stage of the litigation and the discovery conducted by the parties. *See In re Tyco*, 535 F.Supp.2d at 259. In concluding that this factor weighed in favor of a finding of a fair, reasonable, and adequate settlement, the trial justice commented on the extensive discovery in the cases and the multiple dispositive motions that had been filed. We agree that the discovery in these consolidated cases was more than adequate—it included production of more than 700 gigabytes of electronic documents and over four million pages of documents. As such, we hold that the trial justice did not abuse her discretion in ruling as she did with respect to this factor.

Regarding the fourth and fifth *Grinnell* factors, the trial justice found that the risk of failure to establish liability and prove damages was high, relying on the testimony to that effect by both parties at the fairness hearing. She referenced nine pending dispositive motions, which the Union plaintiffs would first need to overcome to reach trial, ultimately determining that these factors weighed in favor of the settlement being fair, reasonable, and adequate. In addition, she noted that the Union plaintiffs recognized the risks of a jury trial, which would have required them to surmount a high burden of proof. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273,

322 (3d Cir. 2011) ("[T]his inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." (quoting *In re Cendant Corp. Litigation*, 264 F.3d 201, 238 (3d Cir. 2001))). Consequently, we cannot say that the trial justice abused her discretion when she weighed these factors in favor of approving the settlement.

The trial justice gave little weight to the sixth and seventh factors—the risks of maintaining the class action through trial and the ability of the defendants to withstand a greater judgment. The trial justice found the latter factor to be neutral because the relief sought was equitable, not monetary. That scrutiny involves "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Sullivan*, 667 F.3d at 323 (quoting *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 537-38 (3d Cir. 2004)). There was testimony at the fairness hearing that the state and municipal defendants might not be able to bear the cost of the restoration of the pension benefits. We are satisfied that the trial justice did not abuse her discretion in affording less weight to these factors because, we agree, in the event that the Union plaintiffs succeeded on their claims at trial, the judgment against defendants would remain principally equitable in nature—namely, a requirement that RIRSA be repealed and pension benefits restored. While we recognize that such an outcome would require the state to pay more money to the Union plaintiffs, such an order would not amount to relief in the form of compensatory damages, such as damages for injuries sought in asbestos litigation. *See Amchem Products, Inc.*, 521 U.S. at 614.

Finally, the trial justice turned to the last *Grinnell* factors, contemplating the "range of reasonableness" of the settlement. She addressed the merits of the constitutional claims in light of pension cases in other jurisdictions, ultimately determining that the combination of the low likelihood of success and the length of time the cases had been pending weighed in favor of a

finding that the settlement is reasonable. These two factors inquire as to "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Insurance Co. of America Sales Practices Ligation*, 148 F.3d 283, 322 (3d Cir. 1998). Both factors "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. In making such a determination, "we must be careful to judge the fairness factors 'against the realistic, rather than theoretical, potential for recovery after trial.'" *Sullivan*, 667 F.3d at 323 (quoting *In re Global Crossing Securities and ERISA Litigation,* 225 F.R.D. 436, 461 (S.D.N.Y. 2004)).

At trial, the Union plaintiffs would have had to meet a higher burden—they needed to "prove beyond a reasonable doubt that the act[s] violate a specific provision of the [Rhode Island] [C]onstitution * * *." *Oden v. Schwartz*, 71 A.3d 438, 456 (R.I. 2013) (quoting *Mackie v. State*, 936 A.2d 588, 595 (R.I. 2007)). Moreover, the challenged legislative enactments would be determined to be constitutional if defendants demonstrated they were "reasonable and necessary to carry out a legitimate public purpose." *Brennan v. Kirby*, 529 A.2d 633, 638 (R.I. 1987). There was testimony at the fairness hearing indicating that the financial crisis in Rhode Island certainly necessitated the challenged pension reform. The trial justice also outlined decisions in other jurisdictions relating to the constitutionality of various pension reforms, finding that the majority of jurisdictions had found that no constitutional right existed to a specific COLA formula. *See, e.g.*, *Maine Association of Retirees v. Board of Trustees of Maine Public Employees Retirement System*, 954 F.Supp.2d 38, 54 (D. Me. 2013); *see also Justus v. State*, 336 P.3d 202, 212-13 (Colo. 2014). Those cases in which there was determined to be a constitutional right are distinguishable on other grounds. *See Moro v. State*, 351 P.3d 1, 39, 41-42 (Or. 2015) (finding that retirees had a constitutional right to their COLA formula where the

31

legislative assembly failed to demonstrate that the state's financial problems "could not be remedied through funding from other sources"). While such cases are instructive, these decisions are certainly not binding in Rhode Island.[14] Consequently, it is clear that the likely outcome of the Union plaintiffs' claims at trial is uncertain, and there are also immediate and substantial looming costs of continuing forward with this action. Indeed, we agree with the trial justice that the Union plaintiffs received "concrete and immediate benefits" from the settlement, including a more favorable COLA formula, two $500 stipends paid to retirees, and a calculation that would reduce the minimum retirement age for employees. While we need not rule on the ultimate merits of the case in considering these two factors, on balance, we acknowledge that these factors would weigh in favor of a determination that the settlement is fair, reasonable, and adequate.

We are satisfied that the trial justice did not overlook any of the concerns raised by the various objectors to the settlement; conducted an exhaustive review of the factors necessary to determine whether the settlement was fair, reasonable, and adequate; and properly balanced the benefits and drawbacks of the settlement. *See Bezdek*, 809 F.3d at 82. We conclude that she did not abuse her discretion in concluding that the settlement was fair, reasonable, and adequate. *See National Association of Chain Drug Stores*, 582 F.3d at 45 ("[T]he [trial] court enjoys considerable range in approving or disapproving a class action settlement, given the generality of the standard and the need to balance benefits and costs.").

---

[14] The Clifford plaintiffs argue that the trial justice erred by not addressing the merits of the Takings Clause claim. However, because she concluded that the Contract Clause claim was unlikely to succeed at trial, it necessarily follows that she did not need to address the Takings Clause claim. *See Cranston Firefighters*, 880 F.3d at 51 ("The lack of any allegation that the current benefits provided by the [s]tate fall below the present value of the contributions made by the Union pensioners, coupled with the absence of the alleged contract, also eliminates the basis for a claim under the Takings Clause.").

## IV

## Conclusion

For the foregoing reasons, the Clifford plaintiffs' and the Retiree plaintiffs' appeals are denied and dismissed, and the judgments appealed from are affirmed. The papers in the case are remanded to the Superior Court.

Justice Robinson did not participate.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Joseph Clifford et al. v. Gina Raimondo, in her capacity as Governor of the State of Rhode Island, et al.<br><br>Rhode Island Public Employees' Retiree Coalition et al. v. Gina Raimondo, in her capacity as Governor of the State of Rhode Island, et al. |
| **Case Number** | No. 2015-379-Appeal.<br>(KC 14-345)<br><br>No. 2016-24-Appeal.<br>No. 2016-25-Appeal.<br>No. 2016-26-Appeal.<br>No. 2016-28-Appeal.<br>No. 2016-49-Appeal.<br>(PC 15-1468) |
| **Date Opinion Filed** | May 25, 2018 |
| **Justices** | Suttell, C.J. Goldberg, Flaherty, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Kent County Superior Court<br><br>Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Thomas M. Dickinson, Esq.<br>Edward C. Roy, Jr., Esq.<br>Lynette J. Labinger, Esq.<br>Michael B. Forte, Jr., Esq.<br>Carly Beauvais Iafrate, Esq.<br>Joseph F. Penza, Jr., Esq.<br>Thomas R. Landry, Esq.<br>Douglas L. Steele, Pro Hac Vice |

| | For Defendants: |  |
| --- | --- | --- |
| | John A. Tarantino, Esq.<br>Nicole J. Benjamin, Esq.<br>Joseph Avanzato, Esq.<br>Patricia K. Rocha, Esq.<br>Rebecca T. Partington, Esq.<br>Michael W. Field, Esq. | |